UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                                     :

UNITED STATES OF AMERICA
                                                     :          07 CR 771 (PAC)

      -against-                         :

                                                   :          <u>ORDER</u>

JENNIFER ROWE
                                                   :

              Defendant.
                                                   :
------------------------------------------------------X

        HONORABLE PAUL A. CROTTY, United States District Judge:

        Defendant Jennifer Rowe ("Defendant" or "Ms. Rowe") is charged with conspiracy to commit visa fraud by conspiring to furnish fraudulent documents to immigrants in violation of 18 U.S.C. § 371. She was arrested at her house in Mount Vernon, New York, at approximately 6:00 a.m. on September 20, 2007, by Immigration and Customs Enforcement Division ("ICE") agents. Rowe moves, supported by her own affidavit, to suppress: (1) all statements allegedly made by her to the ICE agents in the car on the way from her home to the ICE Processing Facility at 26 Federal Plaza, and (2) all statements made while she was hospitalized on the day of her arrest.

        Ms. Rowe contends that her statements in the car were inadmissible because she had not received her <u>Miranda</u> warnings until after her arrival at 26 Federal Plaza, and that her statements in the hospital were not the product of a knowing, voluntary, intelligent waiver of her <u>Miranda</u> rights.

A hearing was held on January 22, 2008, at which two ICE agents testified. Based on the testimony, the affidavit, and the exhibits received in evidence, the Court denies the motion in part and grants in part.

## SUMMARY OF FACTS[1]

Jennifer Rowe is a 50-year-old, Type II diabetic with no prior criminal record.[2] On September 20, 2007, at approximately 6:00 a.m., ICE agents arrested Ms. Rowe at her home in Mount Vernon, New York, pursuant to a warrant issued in the Southern District of New York. Approximately five ICE agents were present at the time of arrest, including one female agent; Special Agent Kristi Wilkes ("Agent Wilkes"). The agents were under the supervision of Special Agent Vincent Parlatore ("Agent Parlatore"). Both Agent Wilkes and Agent Parlatore testified to the events of the day at the suppression hearing on the motion.

According to the agents' testimony, they arrived at Ms. Rowe's house shortly after 6:00 a.m. and were admitted by the Defendant's husband. They found Ms. Rowe asleep in a downstairs bedroom, woke her up, and advised her that she was under arrest. During the course of these events, Ms. Rowe informed the agents that she was diabetic, and told them she had medication for her condition. Ms. Rowe was unable to locate her medication, however, before leaving with the agents.

According to the testimony of the ICE agents, at the time of her arrest Ms. Rowe was crying, and appeared nervous, concerned, and upset. Despite this, she understood the

---

[1] The following facts are derived from the transcript of the testimony given at the suppression hearing on Jan. 22, 2008 ("Tr."), the hearing exhibits ("Ex."), and the affidavit submitted by Ms. Rowe on Dec. 20, 2007 ("Rowe Aff."). To the extent that those accounts diverge, specific facts are attributed to their source.
[2] She was diagnosed with diabetes in 2001, and doctors have prescribed medication (Glucophage—a prescription pill used to treat non-insulin dependent diabetes) to manage her condition. Due to negative side effects, Ms. Rowe indicated that she does not regularly take her medication, and had not taken it on the day of her arrest, nor in the three days preceding. (Rowe Aff. ¶ 4 at 2.)

agents' directions and responded appropriately to questions asked of her. It is undisputed that Ms. Rowe did not receive her Miranda warnings at the time of the arrest. Agent Parlatore testified that he did not read Ms. Rowe her Miranda rights because he did not intend to question her at that time, and that it was his general policy to issue Miranda warnings at the Processing Facility immediately before questioning a defendant. (Tr. at 56, 71, 76.) Furthermore, Agent Wilkes testified that ICE agents have discretion to determine when to issue Miranda warnings based on when they plan to question a particular subject. (Tr. at 35.)

Following her arrest, Ms. Rowe was handcuffed, placed in the back seat of an ICE car, and driven from her home to the ICE Processing Facility at 26 Federal Plaza in New York City, New York. The drive took approximately one hour. On the drive, Ms. Rowe sat with Agent Wilkes in the backseat of the car and engaged in conversation about her work, family, and other matters wholly unrelated to the charges upon which she was detained. According to the testimony of the agents, at one point during the drive Ms. Rowe inquired about matters related to the case, but Agent Parlatore, who was driving, stopped her from speaking further and informed her that they would discuss those matters later. According to Agent Parlatore's testimony, Ms. Rowe asked him "if [he] had any information regarding [her alleged co-conspirator]" and that he responded, "if you want to talk, we can talk at 26 Federal Plaza." (Tr. at 40.) He also stated that he did not ask her any questions because he was driving.

Following her arrival at 26 Federal Plaza, Ms. Rowe was brought to the ICE Processing Facility on the tenth floor where she was photographed and fingerprinted, and completed various pedigree forms. The Processing Facility contains several holding cells, desks manned by law enforcement personnel, multiple tables with computers and

3

benches, and facilities for fingerprinting and photographs. She was offered food (which she declined) and water.[3] At 8:20 a.m., Agent Parlatore informed Ms. Rowe of her Miranda rights, and she signed a form voluntarily waiving those rights. For each right Ms. Rowe waived, Agent Parlatore read the right verbatim from the Miranda waiver form, and then asked Ms. Rowe, "Do you understand?," to which she responded "yes" each time. After the waiver, Agent Parlatore interviewed Ms. Rowe for about ten minutes, and took notes of the statements made.[4] The agent testified that Ms. Rowe appeared coherent, that she understood questions asked of her, and that she followed directions, but seemed "disinterested" and "lethargic" at times. On clarifying these comments, Agent Parlatore indicated that Ms. Rowe did not seem ill so much as "defiant." (Tr. at 60-61.)

After the interview, Agents Wilkes and Parlatore took Ms. Rowe to the hospital for treatment of her diabetes.[5] Ms. Rowe arrived at the hospital at approximately 9:30 a.m. and was seen by a medical professional about thirty minutes later. Tests revealed that Ms. Rowe had high blood pressure, and that her blood sugar was elevated to about three times the normal level. Over the next five hours, Ms. Rowe received insulin injections and prescription medication at the hospital in order to return her blood sugar and blood pressure to normal levels.

---

[3] Agent Parlatore testified that once they arrived at the Processing Facility, "[w]e sat her down. We gave her an opportunity to eat. There were donuts available to her. She refused to have any donuts." (Tr. at 59).
[4] The handwritten notes of the interview were admitted into evidence at the hearing as Government's Exhibit 2 (Gov. Ex. 2). Among other things, Ms. Rowe stated that she received telephone calls from her alleged co-conspirator, cashed several money orders in furtherance of the purported scheme, and that she gave money to a third party involved in the operation. (Gov. Ex. 2.)
[5] Agent Parlatore testified that "Jennifer Rowe did not express that she had to go to the hospital," instead, the agents determined that in light of her diabetic condition, they should seek medical treatment on her behalf. (Tr. at 55.) Agent Parlatore stated that "[o]nce she said that she did not have medication, I knew that we would have to take her to the hospital." (Tr. at 72.) Moreover, they did not take her to the hospital before processing because Ms. Rowe did not request to go, and she did not seem to be in any kind of medical distress. (Tr. at 55.) Once at the hospital, Ms. Rowe resisted receiving her treatment injections. (Tr. at 46.)

4

Around midday, Ms. Rowe was in her hospital room with Agent Parlatore when he received a telephone call about her case. As Agent Parlatore discussed Ms. Rowe's case on his cell phone in her presence, Ms. Rowe made additional statements about her involvement in the alleged conspiracy. She also responded to Parlatore's questions about the matter, although Agent Parlatore testified that he mostly "allowed her to talk. There was very little questioning on my behalf." (Tr. at 47, 74.)

Later that afternoon around 3:30 p.m., Ms. Rowe's blood sugar and blood pressure returned to normal, and she was declared "fit for confinement" by medical personnel.[6] At that point, she was released from the hospital and transferred back into the custody of law enforcement.

## DISCUSSION

**I.   Miranda**

**A. The Miranda Warnings**

On a motion to suppress a statement based on a violation of the Miranda doctrine, the Government bears the burden of demonstrating the admissibility of the statement by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 168 (1986). Miranda warnings must be given "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way" and before questioning by law enforcement begins. Miranda v. Arizona, 384 U.S. 436, 444 (1966). If law enforcement begins a custodial interrogation prior to giving Miranda warnings, any incriminating statements made are generally excluded from later court proceedings. Missouri v. Seibert, 542 U.S. 600, 609 (2004). Once an individual has been advised of his or her

---

[6] A "fit for confinement" document is a form filled out by medical personnel which indicates that a defendant is healthy enough to be in the custody of law enforcement. (Tr. at 15.)

5

rights, however, that "individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." Miranda, 384 U.S. at 479.

### B. Waiver of Miranda Rights

It is well-settled that a valid waiver of rights must be knowing, voluntary, and intelligent. Miranda, 384 U.S. at 479; Johnson v. Zerbst, 304 U.S. 458, 464 (1938). In order to demonstrate that a waiver of Miranda rights is valid, the government must show two things: (1) that the waiver was voluntary, and not the product of intimidation, coercion, or deception; and (2) that the waiver was made with full awareness of both the nature of the right being waived and the consequences of waiving it. United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995) (citing Moran v. Burbine, 475 U.S. 412, 421 (1986)). Whether a valid waiver has been obtained "must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Johnson v. Zerbst, 304 U.S. 458, 464 (1938). It is a "totality of the circumstances" test. Jaswal, 47 F.3d at 542 (citing Moran, 475 U.S. at 421); see also United States v. Male Juvenile, 121 F.3d 34, 40 (2d Cir. 1997).

### C. Requirement to Renew Miranda Warnings

As a general matter, once Miranda warnings have been issued, and law enforcement has obtained a valid waiver, agents need not issue renewed warnings during the course of an interrogation. Missouri v. Seibert, 542 U.S. 600, 608-09 (2004) ("giving the [Miranda] warnings and getting a waiver has generally produced a virtual ticket of admissibility."). Notwithstanding the existence of a valid waiver, however, under certain circumstances, renewed warnings may be required before resuming custodial interrogation. See Wyrick v. Fields, 459 U.S. 42, 47 (1982) (finding that a waiver remains valid, "unless the circumstances changed so seriously that [the defendant's]

6

answers no longer were voluntary, or unless he no longer was making a 'knowing and intelligent relinquishment or abandonment' of his rights") (quoting Edwards v. Arizona, 451 U.S. 477, 482 (1981)). Factors such as a lapse of time, change of location, the occurrence of interruptions, change of subject matter, change of interrogator, or other intervening events can render a previously valid waiver "stale," such that law enforcement must re-issue warnings before questioning the defendant again. United States v. Pruden, 398 F.3d 241, 247-48 (3d Cir. 2005) (holding that passage of time, change of location, and occurrence of intervening events are all relevant in determining whether renewed warnings are required.) At the very least, when these factors indicate, law enforcement should remind the defendant that her rights have been waived. Id. The determination about whether renewed warnings are required depends on the particular facts of each case, and is subject to the same "totality of the circumstances" test as the original waiver. See Jaswal, 47 F.3d at 542; Wyrick, 459 U.S. at 47; Stumes v. Solem, 752 F.2d 317, 319-20 (8th Cir. 1985).

## ANALYSIS

Ms. Rowe asserts two separate arguments: first, that her statements in the car are inadmissible as the product of custodial interrogation without adequate warnings; and second, that her statements at the hospital are inadmissible because the "totality of the circumstances" indicates that her waiver was invalid. The Court shall address each in turn.

### A. No Statements Were Made in the Car and the Statements Made at 26 Federal Plaza are Admissible

It is undisputed that Miranda warnings were not issued at the time of the arrest, and that Ms. Rowe was "in custody" for the purposes of Miranda during the one-hour trip

7

from her home in Mount Vernon to Federal Plaza.  In fact, Ms. Rowe did not receive her Miranda warnings until approximately two hours after her arrest, at 8:20 a.m., at the tenth floor Processing Facility at 26 Federal Plaza.  In any event, the Court finds that no custodial interrogation took place either in Ms. Rowe's home or in the car.

According to the testimony of both Agent Wilkes and Agent Parlatore, the discussion in the car was limited to small talk and matters unrelated to this case.  Ms. Rowe sat next to Agent Wilkes who testified that she had no knowledge of the case.  Both agents testified that Ms. Rowe was not asked any questions about this case, nor was she encouraged to discuss it.  According to the agents, the only mention of the case came when Ms. Rowe herself inquired as to the status of her alleged co-conspirator, at which point the agents refused to discuss the matter further.  Ms. Rowe contends in her affidavit in support of the motion:

> the agents asked me questions during the drive. . . .  I remember one of the agents asking me when [my co-conspirator] had contacted me last and what [he] had said to me during these calls . . . I made a number of statements in response to the agent's questions."

(Rowe Aff. ¶ 6 at 2.)  This affidavit is not persuasive when contrasted with the agents' forthright courtroom testimony, which was subjected to vigorous cross examination.  The Court credits the agents' testimony and finds that the agents did not interrogate Ms. Rowe in the car en route to Federal Plaza.

Further, the Government has demonstrated by a preponderance of the evidence that the statements made by her at 26 Federal Plaza were made after both appropriate warnings and a knowing, valid, and intelligent waiver of her rights.  The agents testified that Ms. Rowe had a clear mind, an understanding of her situation, an awareness of her

8

surroundings, and a willingness to answer the agents' questions.[7] Agent Parlatore read each right to her individually in order to gain her consent.[8] She did not ask for the assistance of counsel, nor did she request medical treatment. Moreover, unlike the relative comfort of the car, the formality of the surroundings at the Processing Facility reflected the gravity of Ms. Rowe's situation, and alerted her of the need to remain vigilant about her rights and any statements she chose to make.

While Ms. Rowe's affidavit states that she "was not feeling well" (Rowe Aff. ¶ 3 at 1), that her "eyes were blurry," and that she was experiencing heart palpitations, these assertions alone do not invalidate her waiver. (Rowe Aff. ¶ 4 at 2.) There is no medical evidence that Ms. Rowe's blood sugar, even if elevated, somehow affected her mental capacity and prevented her from validly waiving her rights. Ms. Rowe introduces no evidence to rebut the Government's showing that the waiver was anything but knowing, intelligent, and voluntary. Ms. Rowe's <u>Miranda</u> warnings were issued—and validly waived—at 26 Federal Plaza. Ms. Rowe's statements to Agent Parlatore during her interview at Federal Plaza are admissible.

### B. Statements at the Hospital

Ms. Rowe also made several statements at the hospital which the Court finds are not admissible. The law is clear that changes in circumstance may require the renewal of <u>Miranda</u> warnings before law enforcement may resume questioning a defendant. The Court finds that renewed warnings were required in this case.

---

[7] Indeed, according to the hearing testimony, Ms. Rowe is well educated (she holds a master's degree in education) which evidences her ability to comprehend the rights and understand the consequences of her waiver. (Tr. at 95.)

[8] <u>See</u> <u>United States v. Male Juvenile</u>, 121 F.3d 34, 40 (2d Cir. 1997) (finding a valid waiver of <u>Miranda</u> rights when FBI agents "read defendant's rights from an FBI form, stopping at each stated right to determine if defendant understood it," and defendant indicated he understood each right and signed the form.)

9

Numerous factors indicate that Ms. Rowe's warnings should have been renewed at the hospital. First, at least four hours had elapsed between the issuance of the warnings at 8:30 a.m. and the statements made in the hospital room around midday. Second, the officers and Ms. Rowe moved from the formal surroundings of the processing center, replete with law enforcement personnel, holding cells, fingerprinting equipment, and other hallmarks of custodial interrogation, to the relative informality of a hospital room where the Defendant was attended by medical professionals. Agent Wilkes testified that she assisted Ms. Rowe as she walked the hallways following her insulin injections, thus changing the tenor of the interaction. (Tr. at 14.) Certainly, the environment shifted from one of rigid enforcement to a more caring and hospitable atmosphere, where candor is encouraged and a patient is expected to speak and describe her condition to facilitate her treatment. Third, the commencement of medical treatment itself altered the situation. Whereas Ms. Rowe was undoubtedly concerned with her arrest and detention earlier in the day, and her awareness of her rights heightened by the formal proceedings, her focus likely shifted at the hospital to her own well-being. To the extent that Ms. Rowe was fully cognizant of her rights at the Processing Facility, her arrival at the hospital, her diagnoses, and her subsequent treatment likely caused her attentiveness to diminish such that she was no longer fully aware of the consequences of responding to Agent Parlatore's questions. Ms. Rowe, in essence, let her guard down. Under the totality of the circumstances, while the Court finds no ill-intent on the part of the agents, we hold that her <u>Miranda</u> warnings should have been re-issued at the hospital before she was permitted to make additional statements. Therefore, the statements made to Agent Parlatore at the hospital are excluded.

## CONCLUSION

The Court finds that Rowe made no statements in the car as she contends. Further, the Court finds that her statements at 26 Federal Plaza were made after she was appropriately warned, and subsequently waived, her <u>Miranda</u> rights. Defendant's motion to suppress those statements is DENIED; with respect to her request to exclude the statements made in her hospital room, it is GRANTED.

Dated:  New York, New York
        January 25, 2008

                                        SO ORDERED

                                        _____
                                        PAUL A. CROTTY
                                        United States District Judge

## CONCLUSION

The Court finds that Rowe made no statements in the car as she contends. Further, the Court finds that her statements at 26 Federal Plaza were made after she was appropriately warned, and subsequently waived, her <u>Miranda</u> rights. Defendant's motion to suppress those statements is DENIED; with respect to her request to exclude the statements made in her hospital room, it is GRANTED.

Dated: New York, New York
       January 25, 2008

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge

11